*Decision will be entered under Rule 50.*

EUGENE FRUIT GROWERS ASSOCIATION, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87425.   Promulgated June 1, 1938.

*Arthur A. Goldsmith, Esq.*, and *I. D. Wood, Esq.*, for the petitioner. *T. G. Histon, Esq.*, for the respondent.

994

OPINION.

Opper: Petitioner contests this deficiency on the ground, first, that it is a tax exempt organization, and, second, that even if it is not, the two controverted items involved in the deficiency were nontaxable, since they do not represent income to the petitioner. The respondent concedes error in his disallowance of two small items, leaving in dispute the $3,062.28 "Building Fund" item and the amount of $5,948.10 deducted from the proceeds of the pools and used for the payment of a 3 percent dividend.

Exemption from tax is claimed under section 103 (12) of the Revenue Act of 1932,[1] which grants exemption to farmers' and fruit

---

[1] SEC. 103. EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this title—

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(12) Farmers', fruit growers', or like associations organized and operated on a cooperative basis (a) for the purpose of marketing the products of members or other producers, and turning back to them the proceeds of sales, less the necessary marketing expenses, on the basis of either the quantity or the value of the products furnished by them, or (b) for the purpose of purchasing supplies and equipment for the use of members or other persons, and turning over such supplies and equipment to them at actual cost, plus necessary expenses. Exemption shall not be denied any such association because

growers' marketing associations organized and .operated on a co-operative basis. Respondent asserts that the provisions of this section, and of the regulation issued in connection therewith,[2] must result in rejection of the claim for exemption if in any respect petitioner fails to meet the requirements therein specified. We have accordingly examined the facts disclosed by the record for the

it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per centum per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association ; nor shall exemption be denied any such association because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose. Such an association may market the products of nonmembers in an amount the value of which does not exceed the value of the products marketed for members, and may purchase supplies and equipment for nonmembers in an amount the value of which does not exceed the value of the supplies and equipment purchased for members, provided the value of the purchases made for persons who are neither members nor producers does not exceed 15 per centum of the value of all its purchases.

[2] [Treasury Regulations 77.] ART. 532. *Farmers' cooperative marketing and purchasing associations, and corporations organized to finance crop operations.*—(a) Cooperative associations engaged in the marketing of farm products for farmers, fruit growers, live-stock growers, dairymen, etc., and turning back to the producers the proceeds of the sales of their products, less the necessary operating expenses, on the basis of the products furnished by them, are exempt from income tax and shall not be required to file returns. Thus cooperative dairy companies which are engaged in collecting milk and disposing of it or the products thereof and distributing the proceeds, less necessary operating expenses, among the producers upon the basis of the quantity of milk or of butter fat in the milk furnished by such producers, are exempt from the tax. If the proceeds of the business are distributed in any other way than on such a proportionate basis, the association does not meet the requirements of the Act and is not exempt. An association which has capital stock will not for such reason be denied exemption, (1) if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 per cent per annum, whichever is greater, on the value of the consideration for which the stock was issued, and (2) if substantially all of such stock (with the exception noted below) is owned by producers who market their products or purchase their supplies and equipment through the association. Any ownership of stock by others than such actual producers must be satisfactorily explained in the association's application for exemption. The association will be required to show that the ownership of its capital stock has been restricted as far as possible to such actual producers. If by statutory requirement all officers of an association must be shareholders, the ownership of a share of stock by a nonproducer to qualify him as an officer will not destroy the association's exemption. Likewise, if a shareholder for any reason ceases to be a producer and the association is unable, because of a constitutional inhibition or other reason beyond the control of the association, to purchase or retire the stock of such nonproducer, the fact that under such circumstances a small amount of the outstanding capital stock is owned by shareholders who are no longer producers will not destroy the exemption. The restriction placed on the ownership of capital stock of an exempt cooperative association shall not apply to nonvoting preferred stock, provided the owners of such stock are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends. The accumulation and maintenance of a reserve required by State statute, or the accumulation and maintenance of a reasonable reserve or surplus for any necessary purpose, such as to provide for the erection of buildings and facilities required in business or for the purchase and installment of machinery and equipment or to retire indebtedness incurred for such purposes, will not destroy the exemption. An association will not be denied exemption because it markets the products of nonmembers, provided the value of the products marketed for nonmembers does not exceed the value of the products marketed for members.

purpose of determining what, if any, of the requirements set forth are absent here.

It is apparently conceded that petitioner complies with the provision that dividends shall be limited to 8 percent, that substantially all of its stock be owned by producers who market through the association, and that products marketed for nonmembers shall not exceed in value those marketed for members. We do not understand respondent's position to be that the building fund reserve, for which the item of $3,062.28 was retained out of the carrot pool by petitioner, is not for a necessary purpose or is not reasonable in amount as required by the statute. Indeed, one example of a "necessary purpose" given by the regulations is "to provide for the erection of buildings and facilities required in business." Respondent urges, however, that petitioner was not "organized * * * on a cooperative basis", and that its operations do not accord with the statutory definition because of its so-called "commercial departments" and because no provision is made for turning back to nonmember producers the proceeds of sales of their products less necessary marketing expenses.

It is true that petitioner's articles of incorporation authorize it to exercise powers much broader than the mere operation of a farmers' marketing cooperative. It is in evidence, however, that at the time of incorporation no Oregon law particularly applicable to the organization of cooperative associations had yet been passed. It is stipulated that petitioner was organized "for the purpose of marketing fruit and other agricultural products for farmers." And petitioner's manager testified that petitioner:

* * * was organized in 1908, and it engaged in the business of processing and marketing fruits and vegetables grown by its members.

Q. Was that the primary purpose of this organization?

---

(b) Cooperative associations engaged in the purchasing of supplies and equipment for farmers, fruit growers, live-stock growers, dairymen, etc. and turning over such supplies and equipment to them at actual cost, plus the necessary operating expenses, are exempt. The provisions of paragraph (a) relating to a reserve or surplus and to capital stock shall apply to associations coming under this paragraph. An association which purchases supplies and equipment for nonmembers will not for such reason be denied exemption, provided the value of the purchases for nonmembers does not exceed the value of the supplies and equipment purchased for members, and provided the value of the purchases made for nonmembers who are not producers does not exceed 15 per cent of the value of all of its purchases.

In order to be exempt under either (a) or (b) an association must establish that it has no net income for its own account other than that reflected in a reserve or surplus authorized in paragraph (a). An association engaged both in marketing farm products and in purchasing supplies and equipment is exempt if as to each of its functions it meets the requirements of the Act.

(c) Corporations organized by farmers' cooperative marketing or purchasing associations, or the members thereof, for the purpose of financing the ordinary crop operations of such members or other producers are also exempt, provided the marketing or purchasing association is exempt under section 103 (12) (see paragraphs (a) and (b) of this article), and the financing corporation is operated in conjunction with the marketing or purchasing association. The provisions of paragraph (a) relating to a reserve or surplus and to capital stock shall also apply to corporations coming under this paragraph.

A. The purpose of the organization was to create an outlet for the products of the farmers of that section on a cooperative basis.

Q. State whether or not this policy has been followed * * * since its organization.

A. It has.

This testimony is uncontradicted, and seems to us to furnish evidence as to the basis of petitioner's organization much more persuasive than the formal terms of a charter. See *Fruit Growers' Supply Co.* v. *Commissioner*, 56 Fed. (2d) 90, 91; *Unity School of Christianity*, 4 B. T. A. 61, 69; I. T. 1914, C. B. III–1, p. 287. We think it must be concluded that petitioner was organized on a cooperative basis.

In addition to the processing and marketing of members' products on a nonprofit basis, petitioner also conducts "commercial departments", which apparently engage in certain other activities. These departments operate a refrigeration plant selling ice and ice cream, maintain a machine shop in which some custom work is done, manufacture vinegar, beverages, and certain "specialties" such as pectin, mayonnaise, salad spreads, pickles, jams, jellies, and juices, and handle certain supplies such as sprays and fertilizers. Besides this, they take over from the producers' "pools" inventories of canned and processed products which have not been disposed of at the end of a reasonable period, "paying" for these items on an estimated fair market basis and thus permitting the more expeditious liquidation of the pools themselves. The products so acquired are disposed of by this department as occasion permits.

The last item is by far the largest in dollar volume. It accounts for $102,409.61 out of total gross sales of all the "commercial departments" of $236,572.42. It may be questioned whether this item is essentially different from the sales made out of the pools themselves, since sales of the same products are made to the same market. Though referred to as a "sale" by the pools, the transfer to the "commercial department" is nothing so imposing, since title to the products is in the association from the beginning. The distinction is principally one of bookkeeping. Sales out of the pools are prorated among the producers in the pool and the proceeds of these sales are distributed only after the sales have been made and the inventory exhausted, there being first deducted an amount later used for payment of dividends. Products not so disposed of, and taken over to be sold by the "commercial department", return a payment to the producers immediately, but this is an estimate of what they would have brought had they been sold from the pool, namely, estimated market price less estimated cost of marketing. Only if these estimates prove erroneous can there be any "profit." And this "profit",

even if it results,[3] is not essentially different from the dividends paid out of pool operations. It goes almost entirely to the producer-members in any event, though not as participants in the operation of the pools but as stockholders. This single factor, however, can not be sufficient to condemn petitioner's plan of operation, since the payment of dividends up to 8 percent is expressly permitted by the revenue act, and petitioner is not authorized to exceed this figure. Petitioner's practice appears to be an appropriate method of solving one of its operating problems and we should be reluctant to conclude that it would thereby become disqualified for exemption.

Another group of products is presumably specially processed or mixed, such as vinegar, "soda fountain supplies", and "specialties." These items are apparently little different from that just described except that the ingredients seem to be "purchased" from the pools from time to time and without awaiting the outcome of the pool operation. We do not understand respondent to contend that the producer members are not paid their pro rata share of the proceeds of the ingredients so used, and there is no evidence in the record to that effect. The purpose is "the salvage of by-products" and the grower members supply the ingredients "in a large part." This was explained by petitioner's manager on the ground that "there are always certain by-products of a fruit-growers' plant which may be better marketed by further processing and by mingling with other products which must be purchased on the outside."

As to the sale of ice and ice cream and the custom work done in the machine shop, the same witness stated:

"The refrigeration is an essential to the marketing of certain fruit products, and the association, for that reason, acquired a refrigeration plant adjoining its property. This refrigeration plant was at that time engaged in a wholesale and retail ice business, and also the manufacture and sale of ice cream. The association continued to carry on these functions in order to balance the operations of the ice plant. * * * The machine shop is necessarily maintained in the plant. The association provided a machine shop, and in order to make that machine shop more profitable, did some custom work there."

It seems to us that all of the activities mentioned originated and were continuously maintained as incidents of the association's principal function, cooperative marketing for agricultural producers. They were, according to the uncontroverted evidence, designed to assist in the efficient performance of that function by facilitating the marketing of products, on the one hand, and by reducing the cost of necessary operations, on the other. The encouragement extended to such enterprises by the favorable provisions of the revenue acts would to say the least be anomalous if the sacrifice of efficient operation were

---

[3] Net income on all the "commercial departments" combined was reported for the year we are considering at $2,957.76.

to be required in order to attain the statutory exemption. We find no justification for such a construction of the law or of the regulations.

We refrain from extended discussion of the phase of petitioner's business involving the purchase of growers' supplies and their resale. The gross sales in this category are negligible, being less than 10 percent of the "commercial" items and approximately 2 percent of total gross sales. For all that appears they were handled at cost, and, although such articles were admittedly supplied "to some extent" to nonmembers, no attempt was made by respondent to elicit further details, it being apparently conceded that "The providing of fertilizers and sprays and other commodities peculiarly essential to fruit and vegetable growers is a matter of importance to an association of this kind." No claim of exemption as a cooperative purchasing association is made by petitioner. And, since no particular significance appears to be attributed by respondent to this specific item, we feel justified in considering this aspect of petitioner's activity as governed by the principles applicable generally to its so-called "commercial" operations.

Looked upon as a whole it seems to us that these "commercial departments" were purely incidental to petitioner's principal purpose. They were conducted, not for their own sake, but as an adjunct and supplement to the cooperative marketing of farm products. See *Producers' Produce Co.* v. *Crooks*, 2 Fed. Supp. 969. This seems to us to be the test, and not the numerical percentage of petitioner's business attributable to those branches. It may be that the proportion of business done could be so great that it would be unreal to consider such operations incidental. Cf. *Hills Mercantile Co.*, 22 B. T. A. 114. On this point we need express no opinion, since in our view no such contention could prevail on the facts before us. The principle we have stated has been applied in construing other subsections of section 103 and similar provisions, and we see no reason to reach a different result here. *Santee Club* v. *White*, 87 Fed. (2d) 5; *King County Insurance Association*, 37 B. T. A. 288; *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U. S. 578; *Unity School of Christianity*, *supra*; *Sand Springs Home*, 6 B. T. A. 198. And it is to be noted that there is no statutory requirement that petitioner be engaged "exclusively" in cooperative marketing, as there was in some of the provisions construed by those decisions, but merely that it be "organized and operated on a cooperative basis (a) for the purpose of marketing the products of members * * *." We believe petitioner falls clearly within that definition.

It is urged with great force on respondent's behalf that petitioner can not be both exempt and nonexempt and that if exempt there

was no ground for the filing of any return or the payment of any tax as to any part of petitioner's income. That may be true, but whether true or not it raises no issue for our determination in this proceeding and we therefore refrain from deciding the question. If, on the one hand, it were possible for petitioner to be exempt as to part of its income and subject to tax as to the balance, there would be no question before us, since petitioner would then have made the return and paid the tax required. If, on the other hand, petitioner is exempt as to all of its income, including that part on which it has already paid the tax, there is nevertheless no question before us, since no claim of overpayment is made and petitioner specifically disclaims any attempt to litigate the necessity of filing a return or paying a tax as to its "commercial income." Petitioner's counsel stated: "No, we are not contending that the commercial department is free from taxation or is exempt. The only thing we are claiming is that the cooperative operations are exempt." There being thus no basis in this contention for a different result on the issue before us, whichever way it might be decided, we refrain from discussing it further. See *Central Co-Operative Oil Association*, 32 B. T. A. 359.

We are thus brought to respondent's final contention, that provision has not been made for participation by nonmember producers. It may first be remarked that it is only when nonmembers participate in operations that they must be permitted to share in the proceeds, and that it is not essential that the privileges of the association be extended to nonmembers in the first place. "The clear intent of this provision of the statute is that nonmember patrons, *if dealt with at all*, will be treated the same as members * * *." (Italics supplied.) C. B. X–2, p. 164. Here, the fact that petitioner's charter fails to establish a profit-sharing arrangement for nonmember producers is deprived of significance by the circumstance that petitioner's marketing business is done exclusively for members. The stipulation of facts recites: "The Petitioner has Marketing Agreements (Exhibit '3') with Growers, *all of whom are stockholders of Petitioner.*" (Italics supplied.) On these facts it seems to us unnecessary that provision should be made for participation in profits by nonmembers until such time as nonmembers participate in petitioner's operations.

This situation furnishes the distinction from the cases cited by respondent. In *Fruit Growers' Supply Co.* v. *Commissioner, supra,* where the petitioner was a cooperative purchasing association, the Circuit Court of Appeals for the Ninth Circuit, in affirming 21 B. T. A. 315, said (p. 92): "Where, however, the corporation engaged in business with nonmembers, the situation to that extent is entirely

different. The nonmember pays the market price. From this market price the petitioner can and did derive a profit." Exemption was accordingly denied. In *Farmers' Union Co-Operative Co.* v. *Commissioner*, 90 Fed. (2d) 488, affirming 33 B. T. A. 225, the corporation operated a grain elevator, feed store, and general merchandise store, and it purchased, sold, and shipped grain and other farm products, and handled machinery supplies and repairs. It claimed that all of its activities constituted either marketing or purchasing on a cooperative basis. It had extensive dealings with nonstockholders, but its bylaws allowed the payment of patronage dividends only to stockholders; nonmember patrons were wholly excluded from any possible participation. Thus in its allegedly cooperative activities of marketing and purchasing it failed to meet the requirement that nonmember patrons are to be treated the same as member patrons in the distribution of patronage dividends. *Producers' Creamery Co.* v. *United States*, 55 Fed. (2d) 104, involved a corporation buying dairy products at market prices and reselling them. Stockholders received a small bonus based on the quantity of the products they furnished, but 30 percent of the petitioner's products were purchased from nonmembers to whom it turned nothing back. Because of this difference in treatment of members and nonmembers in its allegedly cooperative operations, the taxpayer was denied the statutory exemption. A similar result was reached in *Farmers Cooperative Co. of Wahoo, Neb.* v. *United States*, 23 Fed. Supp. 123, and *Farmers Union Cooperative Supply Co. of Stanton, Neb.* v. *United States*, 23 Fed. Supp. 128, decided on the same day on the authority of the preceding case. And cases where exemption was denied under the early revenue acts because of nonmember dealings not then permitted are of course entirely irrelevant to this proceeding. See *Riverdale Co-operative Creamery Association* v. *Commissioner*, 48 Fed. (2d) 711; *Burr Creamery Corporation* v. *Commissioner*, 62 Fed. (2d) 407, affirming 23 B. T. A. 1007.

The amendment contained in the 1926 Act was directly and designedly intended to "assure associations   *   *   *   that the liberal construction   *   *   .*   of existing law is sanctioned by Congress." That liberal construction included "allowing such associations to manufacture their products, to change the form of raw materials, and in some cases to operate subsidiaries, so long as the operations are not conducted on an ordinary profit-making basis." Senate Report No. 52, 69th Cong., 1st sess., pp. 23, 24. For the reasons stated, we believe petitioner's operations bring it within the ambit so defined, and do not at any point exceed the restrictions placed upon organizations seeking exemption. It follows that there is no ground upon which to sustain respondent's determination.

1004

In view of our conclusion on the main issue, it is unnecessary to consider the petitioner's alternative contention that the items giving rise to the deficiency do not in any event constitute income to it.

Reviewed by the Board.

*Decision will be entered for the petitioner.*

Black, Leech, and Hill dissent.