Producers Gin, Inc. v. Commissioner.
Producers Gin, Inc. v. Commissioner
Docket No. 58558.
United States Tax Court
T.C. Memo 1959-106; 1959 Tax Ct. Memo LEXIS 142; 18 T.C.M. (CCH) 469; T.C.M. (RIA) 59106; May 25, 1959
*142 Claiborne B. Gregory, Esq., and Elwood Cluck, Esq., for the petitioner. Charles J. Sullivan, Esq., and Harold A. Chamberlain, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined the following deficiencies in income tax and in additions to tax under section 293(b), I.R.C. 1939: Year
Deficiency
Addition to Tax
1947
$7,508.62
$3,754.31
1948
7,542.94
3,771.47
1949
6,803.57
3,401.79
1950
3,697.05
1,848.53
1951
4,638.65
2,319.33 The issues are: (1) Whether certain amounts were excludable from gross income or deductible as costs of goods sold from 1947 through 1951; more specifically, whether petitioner was an agent of its shareholders, and if so, whether certain amounts collected as an agent and paid over to its shareholders were not a part of petitioner's gross income or deductible as costs, such amounts previously having been included in petitioner's gross income; (2) whether other amounts, some of which represented dealings in petitioner's stock, were properly chargeable to costs in 1948; (3) whether petitioner filed fraudulent returns with the intent to evade tax; (4) whether *143 assessment of the deficiencies for 1947, 1948 and 1950 is barred by the statute of limitations. Findings of Fact The stipulated facts are hereby found. Petitioner is a Texas corporation with its principal place of business in Raymondville, Willacy County, Texas. From 1946 through 1951, petitioner filed the following returns with the collector of internal revenue for the first district of Texas: Year of Return
Date Return Filed
1946
January 31, 1947
1947
March 15, 1948
1948
February 14, 1949
1949
January 6, 1950
1950
February 28, 1951
1951
February 25, 1952
Petitioner was incorporated on June 2, 1943 and its charter stated in part: "we, the subscribers, * * * do hereby form and incorporate ourselves into a voluntary association * * *: * * *
"The purpose for which * * * [petitioner] is formed To construct or purchase or purchase and maintain mills, gins, cotton compresses, grain elevators, wharves, and public warehouses for the storage of products and commodities, and the purchase, sale and storage of products and commodities by grain elevator and public warehouse companies." The circumstances which led to petitioner's formation were *144 as follows: In 1943, certain cotton farmers in the Raymondville area believed that the cotton market had reached an unfavorable condition. The farmers felt that they were not receiving fair treatment from private ginners because the ginners required them to deliver their cotton to the gin on an arrangement known as a "hog-ground" basis, under which the ginners paid a stipulated price regardless of the grade or staple of the cotton; the ginners rushed the cotton through their gins on a per bale production basis; and the ginners in some instances doctored their scales so that they would shortweigh the ginned cotton. These farmers, led by H. R. Wood, owned about the same amount of cotton acreage. They decided that they could best protect their interests by forming a gin which they could control, and concluded that if a group of at least eight farmers would join together, they could profitably operate a gin. In this way their cotton would be ginned at a slower rate and yield a better grade and staple. The farmers would at the same time be free to sell their own cotton and cottonseed. The farmers considered operating the gin as a voluntary association, cooperative or a private corporation. *145 They decided against a cooperative because under such a method they could not select their membership. A majority of the farmers voted to incorporate in order to avoid personal liability. These farmers acquired a gin previously owned by the McCharen Estate and in connection therewith they assumed a note and taxes for prior years. At the time of petitioner's organization in 1943, the farmer-shareholders entered into an agreement with petitioner under which they would bring their bales of cotton to petitioner for ginning and pay petitioner a fee. Profits from the operations of ginning, sterilization, wrapping and inspection would belong to petitioner. If the gin did not have a sufficient amount of cotton to run continuously, petitioner would accept cotton from nonshareholders, such cotton hereafter called outside cotton. The shareholders recognized that this outside cotton would help pay the operating expenses of petitioner's gin. Also, petitioner would sell the outside cotton and cottonseed. The shareholders reserved the right to sell their own cotton and cottonseed. In 1943, they marketed their own cotton but found it difficult to collect and handle the cottonseed. They also *146 determined that petitioner's selling of outside cotton and cottonseed was successful. Thereupon, the shareholders and petitioner agreed that petitioner would make an initial payment for the cotton and cottonseed and would then market the shareholders' cotton and cottonseed as agent for the shareholders. Any excess from such marketing would belong to the shareholders equally. A lawyer approved of this agreement between petitioner and its shareholders. Upon incorporation petitioner issued 80 shares of capital stock at $100 per share to the following individuals in equal amounts: H. D. Bush, M. D. Bush, F. Fitch, J. R. Florence, J. A. Pennington, J. Spilman, J. Torres and H. R. Wood. During the years 1943 through 1951, petitioner's authorized capital stock remained at $8,000. The shareholders transferred the gin to petitioner after its incorporation. Petitioner's shareholders also agreed among themselves that if any of them became dissatisfied with petitioner's operations, or if they wanted to sell their stock in petitioner, the remaining shareholders would purchase the selling shareholder's interest or approve the individual to whom the shareholder desired to sell. A new shareholder *147 would have to be a good citizen in the community and own a cotton farm comparable to the other shareholders. In 1946, 1948 and 1949, certain shareholders sold all or a part of their interests in petitioner at a profit. From 1947 through 1950, petitioner maintained a checking account in the First National Bank of Raymondville, Texas. In 1951, petitioner maintained a checking account in the Raymondville State Bank, Raymondville, Texas. From 1947 through 1950, and in 1951, petitioner authorized the respective banks to honor its trade acceptances. From 1947 through 1951, petitioner entered the checks drawn on its account in a check register. Petitioner did not maintain a general ledger, but its check register was set up in such a way that income derived from or in connection with certain of its operations could be entered in the check register along with the charges attributable thereto. The operations which were handled through the use of debit and credit columns in the check register were planting seed, cottonseed and sacks. Other miscellaneous transactions were entered in columns designated either "General - Debit" or "General - Credit." Petitioner maintained the following records *148 during all or a part of the years 1947 through 1951: Record Maintained
Years Used
Gin books with tickets
1947 through 1951
Settlement tickets
1950, 1951
Summary record of gin tick-
ets
1947 through 1949
Cotton bale daybooks
1950, 1951
Pink bollworm escrow re-
ceipts
1947 through 1951
The gin tickets were prepared in triplicate form. The following information would be recorded thereon: operator delivering cotton to the gin; owner of land on which the cotton was grown; gross, tare and net weight of cotton; weight, price per ton and total price of seed paid by the gin; amount placed in a pink bollworm escrow bank account; amounts charged for ginning, wrapping, sterilization and inspection services rendered; net amount due from or to the gin; and bale number and weight of each bale of cotton obtained from the cotton covered by the gin ticket. In 1950 and 1951, petitioner prepared settlement tickets to record the final cotton and cottonseed settlements. From 1947 through 1949, petitioner made final settlements by referring to the original copy of gin tickets. Petitioner issued trade acceptances on the basis of the settlements. From 1947 through 1950, the *149 trade acceptances were not recorded in any register; in 1951 they were recorded in a cotton account check register. The entries in the summary record of gin tickets were made on a daily basis and were entered on sheets which were designated in the names of individuals delivering the cotton for ginning. The cotton bale daybooks recorded the bale number, the bale weight according to the gin ticket, and the bale weight according to the records of the Valee Compress, Raymondville, Texas. The pink bollworm escrow receipt books recorded the amount withheld pursuant to the pink bollworm regulations of Texas. Petitioner's employees prepared gin tickets when a farmer brought his cotton to the gin from the field. The weights shown on the tickets were ascertained after the farmers drove their vehicles on the scales. An average bale of cotton weighed approximately 1,500 pounds. This consisted of lint, trash and seed in the following approximate percentages: lint - 33 1/3 per cent; trash - up to 15 per cent; seed - 50 per cent. The seed content of the load of cotton brought to the gin was determined by reference to a predetermined percentage. Petitioner used the predetermined percentage *150 method because the seed obtained at the various stands within the gin was discharged into a common pile and could not be identified as to its actual source. In addition the shareholders felt that they would lose too much time if they waited for the seed to be discharged into their trucks. Petitioner's employees prepared the following: trade acceptances for cotton received, credits for cottonseed received and a statement of the net amount owed by the farmers or by petitioner depending upon whether the cost of the cottonseed was more or less than the charges for services rendered. The trade acceptances showed the bale number and weight of the cotton delivered to petitioner by the farmer. In 1949, some bills owed by the farmers were deducted from the amounts of the trade acceptances issued to the farmers. The employees reviewed the gin tickets issued to ascertain the existence of errors. If errors were found, they made appropriate corrections. Petitioner gave all farmers, including the shareholders, credit for the going prices in the Raymondville area for the cotton and cottonseed delivered by them. In 1947, petitioner paid between 37 to 38 cents per pound for lint cotton. In 1948, *151 petitioner paid $75 per ton of cottonseed. In 1947, petitioner sold the lint cotton at 40 cents per pound. From 1947 through 1951, petitioner sold the cottonseed for approximately $5 more per ton than it had initially credited to the farmer. Petitioner incurred transportation costs in transporting cotton to the cotton compress. These costs were approximately $2 per ton. Petitioner also incurred transportation costs for transporting cottonseed to the cotton oil mills. From 1947 through 1949, petitioner maintained records of the number of farmers who delivered cotton and cottonseed to it and the number of such farmers who were its shareholders. The record showed the following: No. of
No. of Farmer-
Year
Farmers
Shareholders
1947
61
6
1948
51
10
1949
82
8
The total number of bales of cotton ginned by petitioner, and the percentage and amount delivered to petitioner from shareholders and nonshareholders from 1947 through 1951, respectively, were as follows: Bales and
Bales and
Total
Per Cent From
Per Cent From
Bales
Year
Shareholders
Nonshareholders
Ginned
1947
1,697 - 57.9
1,234 - 42.1
2,931
1948
2,118 - 63.1
1,238 - 36.9
3,356
1949
2,494 - 62.3
1,510 - 37.7
4,004
1950
2,568 - 90.0
277 - 10.0
2,845
1951
2,409 - 64.6
1,318 - 35.4
3,727
*152 The number of bales of cotton delivered to petitioner by each shareholder from 1947 through 1951 was: Shareholder
1947
1948
1949
1950
1951
A. C. Bush
115
125
143
127
H. D. Bush
366
365
284
256
199
O. Brook
188
275
W. F. Brooks
189
317
354
157
L. L. Ellis
426
309
F. Fitch
252
242
265
28
W. A. Gilliland Farms
121
E. F. Gilliland
* 377
** 236
** 282
T. C. Lambert
285
W. E. McCharen
J. A. Pennington
154
226
C. Roberts
34
428
223
306
C. Smith
207
269
313
334
252
J. Spilman
125
272
385
201
157
H. R. Wood
593
W. C. Youngblood, Jr.
179
191
J. L. Youngblood
154
Totals
1,697
2,118
2,494
2,568
2,409
In 1948, petitioner sought the services of a mechanic who could operate the ginning machine. It hired W. E. McCharen at the beginning of the season. As an added incentive petitioner allowed him to purchase *153 $5,000 of petitioner's capital stock and to share equally with the other shareholders in petitioner's profits. W. E. McCharen was not a farmer during the years 1948 through 1951 and delivered no cotton or cottonseed to petitioner. Petitioner's 1946 through 1951 returns indicated that its sales, costs and gross profits from cotton, and cottonseed and ginning were: Cotton
Profit
Year
Sales
Cost
or (loss)
1946
$413,365.98
$407,114.11
$ 6,221.87
1947
489,654.61
488,266.20
1,388.41
1948
562,434.13
560,995.29
1,438.84
1949
571,445.13
570,057.11
1,388.02
1950
560,675.72
558,983.57
1,692.15
1951
593,490.70
600,011.51
(6,520.81)
Cottonseed and ginning
1946
$ 86,371.34
$ 33,369.37
$53,001.97
1947
133,687.81
86,060.06
47,627.75
1948
174,418.15
134,337.55
40,080.60
1949
96,931.73
45,487.47
51,444.26
1950
107,035.91
71,289.00
35,746.91
1951
144,588.92
89,765.84
54,823.08
After the close of the 1947 ginning season, petitioner issued a $3,000 trade acceptance, dated October 6, 1947, to each of its 6 shareholders with the notation "Cotton Payment" written thereon. These trade acceptances totaled $18,000 *154 and were included in the $488,266.20 cost of cotton shown on the 1947 return. The foregoing $488,266.20 and the related cotton sales of $489,654.61 were both understated by $31.50 on the 1947 return. Respondent disallowed petitioner's inclusion in the 1947 return of the amount of $18,000 as a cost of cotton. J. A. Pennington received one of the $3,000 trade acceptances. He believed that the $3,000 represented a cotton or cottonseed payment. On May 18, 1953, in an interview with one of respondent's agents, he stated that the $3,000 payment could have been a check for a dividend or for cottonseed. J. Spilman received one of the $3,000 trade acceptances and reported it in the schedule of farm income and expenses of his 1947 return as follows: "Prod. Gin. Co. Raymondville - dividend 3,000.00." He believed that this payment represented profits from the sale of cotton or cottonseed and was not a dividend from the processing of cotton by petitioner. Petitioner employed H. R. Wood as manager during the year 1947. On May 30, 1947, petitioner's board of directors met and created a formula for the manager's salary. The minutes of that meeting provided, in part: "we employ H. R. Wood to *155 manage gin sime [some] as last year with the difference that his compensation this year will be 15 per cent of net profits after income tax and insurance is deducted. * * *" On October 6, 1947, petitioner paid the manager $4,054.71 as compensation for services rendered in 1947. The retained copy of petitioner's 1947 return contained a worksheet prepared by petitioner's accountant sometime in 1947 showing an estimate of petitioner's operations. The computation of the manager's compensation appeared in this worksheet. On August 17, 1948, petitioner issued checks for $1,000 to its 10 shareholders. Each check had the notation "Seed rebate" written thereon. On August 26, 1948, petitioner issued a check for $250 to W. E. McCharen. These 11 checks, totaling $10,250, were included in the $99,255.64 cottonseed account which was part of the $134,337.55 cost of cottonseed and ginning in the 1948 return. T. C. Lambert, a shareholder of petitioner who did not gin exclusively with petitioner in 1948, received one of the $1,000 checks. He believed that the $1,000 represented a seed rebate. On February 16, 1953, in an interview with one of respondent's agents, he stated that he did not know *156 what the check represented, but in his opinion it was a seed rebate. J. A. Pennington received one of the $1,000 checks and reported it in his return as a "cotton" check. He believed that it could have been for cottonseed or a dividend. On May 18, 1953, in an interview with one of respondent's agents, he stated that the $1,000 payment could have been a dividend check or a cotton check. In 1948, E. F. Gilliland and his two sons, one of whom was W. A. Gilliland, operated a farming partnership and delivered some of their cotton and cottonseed to petitioner. The income received and the expenses incurred were borne equally by E. F. Gilliland and his two sons. Petitioner issued one of the $1,000 checks, dated August 17, 1948, to W. A. Gilliland Farms. W. A. Gilliland endorsed and deposited the check. The proceeds were divided equally between W. A. and E. F. Gilliland. The other partner, W. A. Gilliland's brother, did not receive any of the proceeds. C. Smith received one of the $1,000 checks and reported it as cotton income in his return. The 1946 and 1947 returns indicated that petitioner held as an asset $1,000 of shares in its treasury. This item was eliminated in the 1948 return *157 and included in the 1948 cost of cottonseed and ginning. In 1948, petitioner purchased by check No. 3670, dated August 10, 1948, its shares held by H. R. Wood for $10,000. The stub in petitioner's checkbook contained the notation "H. R. Wood" and under H. R. Wood "Cap. Int." Petitioner's 1948 check register indicated that check No. 3670 was entered in the "Bank" column and in the "Capital interest" column. The entry in the "Capital interest" column was crossed out and transferred to the "General" column. This $10,000 purchase was included in the 1948 cost of cottonseed and ginning. On August 31, 1948, the last day of the 1948 ginning season, petitioner issued check No. 3938 to the First National Bank of Raymondville, Texas, in the amount of $2,000. H. R. Wood signed the check on behalf of petitioner. The notation "Balance Cotton Picking a/c" was written thereon, and the endorsement of H. R. Wood appears on the reverse side of the check. This check was charged to the cottonseed account on petitioner's books and was included in the 1948 cost of cottonseed on the 1948 analysis of cottonseed costs. Respondent disallowed petitioner's inclusion in the 1948 return of the amount of $23,281.16 *158 as a cost of cottonseed and ginning. The $23,281.16 consisted of the following items: $10,250 - payments to shareholders; $1,000 - elimination of treasury stock; $10,000 - purchase of stock; $2,000 - unsubstantiated check to bank; and $31.16 - miscellaneous debits and credits. Petitioner's worksheet used in preparation of its 1948 return indicated that the components of the cost of cottonseed and ginning were: Cottonseed account
$ 99,255.64
Ginning account
8,473.85
Picking account
8,915.18
Planting seed account
6,014.80
Sack account
617.50
[Unidentified]
2,060.58
$134,337.55 The correct addition of the foregoing is $125,337.55. Petitioner concedes $9,000 as an error in addition and $2,060.58 as an unidentified deduction. The 11 checks totaling $10,250 were included in the $99,255.64 cottonseed account. From August 17, 1949 through October 16, 1949, petitioner issued 72 checks to its shareholders which totaled $22,503.19. One of the following notations was written on each of the checks: "Seed rebate," "Seed on cotton," "Cottonseed," "Cottonseed a/c," "c/s," "bal. cottonseed a/c," "balance cottonseed a/c." These checks were included in the $45,487.47 *159 cost of cottonseed and ginning in the 1949 return and were issued in varying amounts as follows: Total
No.
amounts
Name of payee-
of checks
(in even
shareholder
received
dollars)
W. E. McCharen
7
$2,275
F. Fitch
8
2,500
W. Brooks
9
2,500
E. Gilliland
8
2,500
C. Smith
9
2,502
C. Roberts
7
2,600
A. C. Bush
8
2,509
H. D. Bush
8
2,521
J. Spilman
8
2,594 Five of the shareholders received a group of checks in excess of $2,500, respectively. $228.19 of these checks represented amounts on gin tickets that petitioner owed to these 5 shareholders from the receipt of cottonseed. After deducting each of the 5 shareholders' portion of the $228.19 from the total amount received, the net payment to each was $2,500, except for W. E. McCharen. Respondent disallowed petitioner's inclusion in the 1949 return of the amount of $22,275 as a cost of cottonseed and ginning, which was the difference between $22,503.19 and $228.19. From July 31, 1950 through August 12, 1950, petitioner issued 51 checks to its shareholders which totaled $20,822.06. The notation "Seed rebate" was written thereon. These checks were included in the $71,289 cost of cottonseed *160 and ginning in the 1950 return and were issued in varying amounts as follows: Total
No.
amounts
Name of payee-
of checks
(in even
shareholder
received
dollars)
W. E. McCharen
7
$1,300
F. Fitch
6
1,501
W. Brooks
3
1,724
C. Smith
3
1,554
C. Roberts
3
1,692
A. C. Bush
3
1,365
H. D. Bush
3
1,391
J. Spilman
4
1,520
O. Brook
3
2,021
W. C. Youngblood
4
2,573
L. L. Ellis
3
1,415
E. F. Gilliland
5
1,759
W. A. Gilliland
4
1,000
Eleven of the shareholders received a group of checks in excess of $1,300, respectively. $3,922.06 of these checks represented amounts on gin tickets that petitioner owed to these 11 shareholders from the receipt of cottonseed. After deducting each of the 11 shareholders' portion of the $3,922.06 from the total amount received, the net payment to each was $1,300, with the exception of E. F. Gilliland whose net amount equaled $1,600. Respondent disallowed petitioner's inclusion in the 1950 return of the amount of $16,900 as a cost of cottonseed and ginning, which was the difference between $20,822.06 and $3,922.06. From August 10, 1951 through September 5, 1951, petitioner issued 143 checks to *161 its shareholders which totaled $16,900. None of the checks were supported by gin tickets. Each shareholder received 11 checks totaling $1,300. The notation "Seed rebate" was written on 141 of these checks. These checks were included in the $89,765.84 cost of cottonseed and ginning in the 1951 return. One of petitioner's employees issued these checks pursuant to the instructions of H. D. Bush or Opal McCharen, petitioner's president and assistant manager, respectively. Respondent disallowed petitioner's inclusion in the 1951 return of the amount of $16,900 as a cost of cottonseed and ginning. The checks issued during 1949, 1950 and 1951 were written during several different calendar periods in each year and were not for equal amounts. With few exceptions, the net payments to each shareholder in a particular calendar period totaled the same amount and were as follows: Amount of payments to all
shareholders except McCharen
No. of
Amount of
Period covered
share-
periodic
Payments to
by checks
holders
payments
Total
McCharen
1949
8/17/49 - 8/23/49
8
$ 500
$ 4,000
$ 425
8/30/49 - 9/ 1/49
8
500
4,000
425
9/ 5/49 - 9/10/49
8
500
4,000
425
10/11/49 - 10/16/49
8
1,000
8,000
1,000
$20,000
$2,275
1950
7/31/50 - 8/ 5/50
13
$ 300
$ 3,900
8/ 7/50 - 8/ 8/50
13
500
6,500
8/ 9/50 - 8/12/50
13
500
6,500
$16,900
1951
8/10/51 - 8/11/51
13
$ 300
$ 3,900
8/14/51 - 8/17/51
13
300
3,900
8/20/51 - 8/23/51
13
300
3,900
8/27/51 - 8/29/51
13
200
2,600
8/30/51 - 9/ 5/51
13
200
2,600
$16,900
*162 Many of these checks were written at the same time. In several instances the chronological sequence of the check dates and the numerical sequence of the related check numbers differed. The 1949 and 1950 checks were assigned check numbers in an irregularly interrupted numerical sequence. Some of the 1951 checks were issued in a numerical sequence in which there was an interval of 2 checks between each check issued. Petitioner paid the following dividends to its shareholders: Amount paid
Individual
Year
Total
shareholders
1947
1948
$5,500 $500
1949
4,500
500
1950
6,500
500
1951
2,600
200
E. J. Krogman, a licensed public accountant in Texas for 15 to 20 years, was petitioner's accountant from 1947 through 1951. He supervised petitioner's books and prepared its financial statements and income tax returns. He discussed the returns with the officers and officials of petitioner. Pflughaupt, a certified public accountant, reconciled petitioner's returns with its books and records for the years 1947 through 1951, respectively. He found that the figures on the books were reflected in the respective returns. Petitioner did not file false and *163 fraudulent returns with intent to evade for the years 1947 through 1951. Petitioner and respondent executed timely waivers of the statute of limitations for 1949 and 1951. No waivers were filed for 1947, 1948 and 1950. The deficiencies in petitioner's income tax for 1947, 1948 and 1950 are barred by the statute of limitations. From 1947 through 1951, petitioner received, ginned and sold outside cotton and cottonseed on its own behalf and not as agent for its shareholders. Except for the amounts of $2,805.75 and $2,710.13, the amounts received by petitioner were its income for 1949 and 1951, respectively. The amounts of $2,805.75 and $2,710.13 belonged to petitioner's respective shareholders and are excludable from petitioner's income in 1949 and 1951, respectively. Opinion We find no such evidence of fraud as to sustain respondent's burden. Our ultimate findings dispose of these issues in petitioner's favor with the result that the addition to tax under section 293(b), I.R.C. 1939, is disapproved, as well as the deficiency in tax for the years 1947 and 1948, which are hence concededly barred by the statute of limitations. [1] This also applies to 1950, as to which respondent *164 recognizes that Colony, Inc. v. Commissioner, 357 U.S. 28, prohibits application of section 275(c).
As to the deficiencies for the 2 remaining years, the record requires us to sustain most of the deficiency by reason of petitioner's failure of proof. It makes no contention that we should disregard the corporation and its activities completely, cf. New Colonial Co. v. Helvering, 292 U.S. 435; Moline Properties v. Commissioner, 319 U.S. 436; Interstate Transit Lines v. Commissioner, 319 U.S. 590; National Carbide Corp. v. Commissioner, 336 U.S. 422, and indeed we could not do so in view of petitioner's continuous corporate activity in the very field for which it was organized. Petitioner's ginning operations and whatever income was received from them were concededly petitioner's own and no basis exists for attributing them to any other taxpayer. "[These] farmers * * * simply organized a corporation and had an agreement *165 that * * * the corporation would do the ginning, and profits from ginning would belong to the corporation * * *." (Petitioner's reply brief.) For present purposes we may accept the existence of some sort of an agreement among petitioner's original stockholders and those who subsequently purchased its shares. We may even assume that that agreement took the form of designating petitioner as the agent of its stockholders for the purpose of disposing of their cotton and cottonseed and transmitting to them the net sales proceeds. See, e.g., Eugene Fruit Growers Association, 37 B.T.A. 993; Colony Farms Cooperative Dairy, Inc., 17 T.C. 688; Home Builders Shipping Association, 8 B.T.A. 903. Such an agreement would, however, have to be limited to the cotton delivered by the stockholders themselves, eliminating that which was ginned by petitioner for outsiders. This follows from petitioner's own presentation of the case, from which it appears that "[the] farmers who organized Petitioner [presumably in 1943] entered into an agreement, involving all the stockholders and the Petitioner, * * * that any excess received for the cotton and the cottonseed *166 would be divided equally among the members of the pool. * * * At first the pool group retained the privilege of picking up their own cotton and their cottonseed and marketing it themselves. * * * This privilege did not extend to cotton and cottonseed resulting from the ginning of cotton brought in by people who were not members of the pool. By 1947, however, the members of the pool had agreed to let Petitioner, as their agent, take all cottonseed to the oil mill and all cotton to the compress, whether it was brought in by pool members or by outsiders. * * * As a practical matter it had become a waste of time for the individual members of the pool to stop by and pick up their own seed and their own cotton. [Petitioner's brief; Italics added.]" It seems to us there can be no question that, whatever development there may have been with respect to the marketing of cotton and seed belonging to the stockholders instead of their transporting it themselves to the market, any profit made by petitioner with respect to "outside" sales was not covered by the agreement. There are several factors supporting this interpretation of the agreement, both in the details of the record and in the *167 descriptive statements appearing throughout petitioner's brief. It would be idle to suggest that the evidence is internally consistent, or that all of it points in one direction. But the following are some of the aspects which seem to us to indicate that whatever agreement was made related only to the cotton which was brought to the gin and belonged to the individual stockholders: One of the incorporators testified: "Q. Did you authorize the Producers Gin, Incorporated, to take your part of the seed and your part of the cotton and sell it and give the excess to you? "A. Yes, sir." [Tr., p. 67.] Another that: "A. Well, if the cotton or cottonseed brought more money than the gin had paid us, we was to receive a pro rata share * * *." [Tr., p. 127.] And again: "Q. * * * [You] have testified that you were to receive the excess proceeds received from the sale of cottonseed and cotton if the market price to the corporation was greater than the price paid you by the corporation, is that correct? "A. Yes, sir. [Tr., p. 128.] "Q. Mr. Smith, are you sure that you got money which constituted excess received on cottonseed brought to the gin by other people than the people *168 in the pool? "A. No, I am not sure. * * * I don't know. I have no way of knowing. * * * "Q. * * * [They] are talking about your getting all of the money received, you and the group getting all the money received for cottonseed when some of that seed was brought to the mill by other people. "A. No, I didn't get all. "Q. I'm asking you, did you get it, did the group get all the cottonseed? "A. No, no." [Tr., p. 96.] Although it was asserted that the "outside" cotton was bought by the "pool" of stockholders rather than by petitioner, it is clear that the pool had no funds and it was petitioner who actually paid for the cotton. Payments to the stockholders were referred to both by them and by petitioner as "Seed rebate" and the stockholders as "a cooperative group of farmers," terms which would only be appropriate if they referred to sales resulting from cotton belonging to the shareholders. Again, on the theory that the agreement included "outside" cotton, according to petitioner's figures for the 4 years as a whole, [2] nothing was earned from the ginning business; and more was realized from the seed excess than was distributed in every year even though petitioner *169 insists that the difference did not belong to petitioner but to the "pool members." In other words, the ginning operations, even for outsiders, would have been conducted at a loss; and the socalled "pool" could never have insisted on receiving all it was entitled to from the other operations. Both aspects make this version too unbelievable to be accepted. Repeated references in petitioner's brief make it appear that this is also *170 the interpretation placed by it on the nature of the agreement. For example: "It is true that the members of the pool could have surrendered the right to this excess and retained for themselves only the payments which they received when they brought their bales of cotton to the gin. [Page 43.] "The pool members do not seek to take for themselves profits from any corporate activity, such as the activity of ginning, but simply the excess value which they had in their cotton and cottonseed * * *. [Page 43.] "The pool members could have arranged to collect the excess * * * at the time the bales were brought to the gin * * * [presumably by them]. [Page 44.] "[The] gin tickets and the settlement pads * * * only reflected payments made to the farmer when he brought his bales of cotton to the gin. Payments made to the pool members on account of excess received for cottonseed obviously would not have been reflected in any gin tickets or settlement pads. [Page 40.]" And the case relied upon by petitioner, Louis C. Rollo, 20 B.T.A. 799, would not be apposite except on the theory that the only income covered by the agreement was that for which the stockholders *171 themselves were responsible. So construed, the agreement would meet the requirements for a nontaxable cooperative to the extent of member sales of cottonseed. Pomeroy Cooperative Grain Co., 31 T.C. 674 (Dec. 31, 1958). There was a pre-existing legal obligation; the members' cotton never became the property of the cooperative; and no nonmember business accrued to the advantage of the members. And that the corporation was not organized as a cooperative is not fatal. Eugene Fruit Growers Association, supra; United Cooperatives, Inc., 4 T.C. 93. The profits in question never belonged to petitioner and did not become a part of its income. Clover Farm Stores Corporation, 17 T.C. 1265. And the fact that distributions were made equally is of little significance since it may well have been considered simpler to regard all deliveries of cotton as substantially equal, as over the years they in fact almost were, than to engage in a complicated accounting procedure to determine the exact proceeds of each delivery and sale. The small difference we view as de minimis. When it comes to computing the amounts of exclusion from petitioner's income, *172 however, we encounter greater difficulty. The actual amount received for cottonseed belonging to the stockholders nowhere appears.[3] We have included in our findings the only figures in the record which are composed of a total amount for gross profit on cottonseed and ginning combined n4 and which are all-inclusive in lumping together member and nonmember business. Under the doctrine of Cohan v. Commissioner, (C.A. 2) 39 Fed. (2d) 540, however, we have arrived at an amount for each of the 2 years remaining in issue, which is the best approximation available to us of the amounts received by petitioner for cottonseed which it sold for the account of its shareholders, and which is hence excludable from its own income. Clover Farm Stores Corporation, supra.In this approximation we have heeded the admonition of the Cohan case, that it may be necessary to bear heavily against the taxpayer, the inexactitude of whose figures are of its own making. The amounts in question appear in our findings. They are arrived at primarily by assuming the net profit per ton received for the cottonseed and applying that figure to the quantities estimated by employing the proportion *173 of total cotton handled which appears to have belonged to the stockholders. Except for such amounts, nothing is excludable or deductible from petitioner's income for the 2 years in question. It follows that for the years 1947, 1948 and 1950, there are no deficiencies, and for the years 1949 and 1951. Decision will *174 be entered under Rule 50. Footnotes
*. The record indicates that Gilliland Farms delivered these bales to petitioner. ↩
**. The record does not distinguish between bales delivered by E. F. Gilliland and W. A. Gilliland. Both were shareholders in 1950 and 1951 and received payments.↩
1. Petitioner concedes that it erroneously understated its net income by some $9,000 for the year 1948: but since that year is barred, it is difficult to see how this sum can be taken into account.↩
2. ↩
1948
1949
1950
1951
(In Even Dollars)
Income from cottonseed and ginning on return
$174,418
$ 96,931
$107,035
$144,588
Less - amount petitioner claims it could
have excluded
24,505
29,290
20,820
27,240
Corrected income
$149,913
$ 67,641
$ 86,215
$117,348
Cost of cottonseed and ginning on return
134,337
45,487
71,289
89,765
Less - amount paid to its shareholders and
deducted as costs of goods sold
10,250
22,275
16,900
16,900
Corrected cost
$124,087
$ 23,212
$ 54,389
$ 72,865
Gross profit
25,825
44,429
31,826
44,483
Expenses on return
37,120
43,194
33,102
41,836
Net profit or (loss)
($ 11,295)
$ 1,234
($ 1,275)
$ 2,646
Total for 4 years - (loss) ($8,689)
3. "Q. Do you know what part of the excess on cottonseed, say in 1948 which was obtained, do you know what part of that in terms of dollars, what percent of that in terms of dollars was distributed to the members of the pool and what percent was kept by the gin? "A. I sure don't. "Q. Well, is it true that some percent was kept by the gin? A. That's my understanding, that the gin kept part of it and reported and paid tax on it. I don't know. * * *
"A. What I meant was I had no way of isolating my seed from the other parties, that's what I meant." [Tr., pp. 96-97.] n4 We have mentioned only ginning and cottonseed because, as petitioner's brief points out, "* * * money was made on cotton in 1947, as distinguished from * * * all subsequent years [in which] there was virtually no excess received from cotton * * *." 1947 is one of the barred years.↩